1  MATTHEW ABBASI, ESQ.; SBN 215030
   **ABBASI LAW CORPORATION**
2  8889 WEST OLYMPIC BOULEVARD, SUITE 240
   BEVERLY HILLS, CALIFORNIA 90211
3  TELEPHONE: (310) 358-9341
   FACSIMILE:   (888) 709-5448
4
   ATTORNEY FOR DEBTOR, AND DEBTOR
5  -IN-POSSESSION, TUL INVESTMENTS, INC.

6              **UNITED STATES BANKRUPTCY COURT**

7              **CENTRAL DISTRICT OF CALIFORNIA**

8                 **SAN FERNANDO DIVISION**

9

10  In re:                              | **Case No.: 1:16-bk-12869-MT**

11                                      **Chapter 11 Proceedings**

12                                      **DEBTOR'S DISCLOSURE STATEMENT
13                                      DESCRIBING DEBTOR'S CHAPTER 11
                                        PLAN WITH SUPPORTING DECLARATIONS**
14  TUL INVESTMENTS, INC.
                                        Disclosure Statement Hearing
15                                      DATE: TBD
                                        TIME: TBD
16                                      PLACE: Courtroom 302
                                        U.S. Bankruptcy Court
17         Debtor and Debtor in Possession.   21041 Burbank Boulevard
18                                      Woodland Hills, CA 91367

19                                      Plan Confirmation Hearing
                                        DATE: TBD
20                                      TIME: TBD
                                        PLACE: TBD
21

22
                              **I.**
23
                         **INTRODUCTION**
24
        Tul Investments, Inc., a California Corporation (the "Debtor"), is the Debtor and the
25
    Debtor-In-Possession ("DIP") in this Chapter 11 case.  The Debtor began its Bankruptcy case by
26
    filing a petition under Chapter 11 of the U.S. Bankruptcy Code (the "Code") on **October 3, 2016**.
27
    Chapter 11 Bankruptcy allows a debtor, and under some circumstances, Creditors and other
28

                                        1

"parties in interest," to propose a Plan of Reorganization (the "Plan"). Any Plan may provide for the Debtor to reorganize by continuing to operate; to liquidate by selling assets of the Estate; or a combination of both.  In this instance, the Debtor is the party proposing the Plan.

**THE DOCUMENT YOU ARE READING IS THE DEBTOR'S DISCLOSURE STATEMENT (the "Disclosure Statement") FOR THE PLAN (the "Plan") WHICH WILL BE SUBMITTED FOR VOTING AFTER THE COURT APPROVES THE DISCLOSURE STATEMENT.**

This is a Reorganizing Plan. The Debtor seeks to make payments under a Plan paying Creditors a down payment and a monthly payment from its net income. The Debtor plans to use the upcoming dissolution of one of its holdings  to fund the Plan. If a quick dissolution cannot be achieved, the Debtor's Plan contemplates a loan secured by Estate property.

As it stands, the Debtor is working on its 2016 financials (taxes, and profit/loss) which will be needed to obtain a loan to fund the Debtor's Plan. Furthermore, the Debtor is in middle of litigating an involuntary dissolution action which hopefully will be resolved in the next 60-90 days. Overall, the Debtor is confident that it will be able to secure the needed monies to fund its repayment Plan.

**The Effective Date shall be 30-Days following Entry of an Order approving and Confirming the Plan.**

**A.    Summary of Facts**

The Debtor is a real estate investment company that owns and manages its interest in other entities. As set forth herein, the Debtor has no secured creditors and no creditor has a security claim on any of the Debtor's income. However, there are two (2) pending disputes between the owners of the Debtor in the United States and Israel which have caused over a decade of litigation. The following summarizes the Debtor's assets, ownership, and Creditors (with Plan treatment):

1.    Debtor's Assets:

The Debtor has the following corporate ownerships which are not in dispute:

- 50% of a company called GOLDEN WEST REAL ESTATE, LLC ("GW"); and
- 50% of a company called TUL ANTHONY, LTD ("Tul Anthony").

The above-cited companies own the following real properties:

- GW owns 100% of a commercial property located at 1880 S. Western Ave., Los Angeles California ("Western Property").

- Tul Anthony owns 14% of an entity named BALBOA PLAZA, LLC ("BP") which owns a commercial property located at 17050 Chatsworth Street, Grenada Hills, California ("Chatsworth Property").

- Tul Anthony owns 100% of an entity named TUL RESEDA, LP ("Tul Reseda") which owns a commercial property located at 7126 Reseda Blvd., Reseda, California ("Reseda Property").

The Debtor does not directly own any real property but the Debtor is the 100% equitable owner of a commercial property located at 101-107 Barrington Way, Brentwood, California (the "Brentwood Property"). The Brentwood Property is currently legally owned by the Stelmach Family 2002 Living Trust ("SFT") but the true and correct owner of this property has always been the Debtor.

As set forth in the Declaration of Yuval Stelmach, the Brentwood Property was purchased on or about **October 31, 1995** by the Debtor and was owned free and clear by the Debtor until 2003. Thereafter, on or about **December 16, 2003,** the Debtor conveyed title of this property to the SFT in order to qualify for a loan. This transfer was needed to obtain a loan because the Debtor did not have sufficient credit to obtain a loan on its own. Consequently, this property had to be transferred into SFT and the loan had to be personally guarantee by Yuval and Tally Stelmach. This loan has since been paid-off but due to pending litigation this property has not been re-conveyed to the Debtor before the filing of the Petition. However, if needed, this property can be re-conveyed easily. *See Declaration of Yuval Stelmach and Exhibit "A" and "B."*

The Debtor does not own any other real property, corporate, or any other assets.

2.    Debtor's Owners:

As of the date of this Disclosure Statement, the Debtor has an two (2) unresolved ownership disputes which the Debtor does not seek to resolve via its Plan. Based on the books and records of the Debtor, the following is a listing of the Debtor's disputed ownership:

- Shlomo Goldberg ("Goldberg") owns 7.5% of the Debtor.

- Estate of Lea Goldberg (Shlomo Goldberg's deceased wife) owns 7.5% of the Debtor.

▪ Yuval and Tally Stelmach ("Stelmach") own the remaining 85% of the Debtor.

As explained in the Declaration of Yuval Stelmach, the Estate of Lea Goldberg is the subject of a Will contest in Israel. The Debtor Plan's shall not determine the ownership of the 7.5% owned by Lea Goldberg. Instead, the Debtor's shall allow the Will contest proceedings determine Lea Goldberg's ownership in the Debtor.

3.    Creditors and Plan Treatment of Claims:

As set forth herein, the Debtor shall fund its Plan by the cash it has on hand and by the sale of its assets or via a loan secured by its assets. As it stands, the Debtor has about $65,000 in cash on hand; earns about $20,000 a month (net); and can generate about $250,000 (net) from the pending dissolution of GOLDEN WEST REAL ESTATE, LLC ("GW"). Further, if the Debtor is unable to dissolve GW, the Debtor will be able to obtain a loan for $250,000.00 secured by Estate property. Therefore, the Debtor will able to fund its Plan with at least $300,000 in cash and monthly payments of $20,000.

The Debtor's Plan proposed treatment of claims as follows:

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| ADMINISTRATIVE (LEGAL FEES & COSTS) | $20,000.00 (estimate) | NO | Paid in full on Effective Date |
| ADMINISTRATIVE (US TRUSTEE) | TBD | NO | Pay via Quarterly Payment through Plan |
| Class 1 (UNSECURED- CONTRACTOR) | Gil's Electrical Service Proof of Claim No. 4 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 1 (UNSECURED- CONTRACTOR) | AZ Air-conditioning & Heating Proof of Claim No. 5 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 1 (UNSECURED- CONTRACTOR) | Pacific Builders Proof of Claim No. 6 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 2 (GENERAL- UNSECURED) | Gil Naor Proof of Claim No. 7 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 2 (GENERAL- UNSECURED) | Assaf Naor Proof of Claim No. 8 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 3 (JUDGMENT- UNSECURED CREDITOR) | Shlomo Goldberg Proof of Claim No. 2 | YES | 50% of Claim; Amount TBD after Claim Objections. |

| | | | |
|---|---|---|---|
| Class-4 (LINE OF CREDIT- UNSECURED CREDITOR) | East West Bank (has not yet filed a proof of claim) | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class-5 (EQUITY-OWNERSHIP) | Shlomo Goldberg owns 7.5% of Debtor | NO | Goldberg will own 7.5% as of Effective Date. |
| Class 5 (EQUITY-OWNERSHIP) | Estate of Lea Goldberg's owns 7.5% of Debtor. | NO | Estate of Lea Goldberg's will own 7.5% as of the Effective Date. |
| Class 5 (EQUITY-OWNERSHIP) | Yuval and Tally Stelmach own the remaining 85% of the Debtor. | NO | Yuval and Tally Stelmach will own 85.00% as of Effective Date. |

The Debtor has no secured Creditors. Further, the Debtor does not have any priority Creditors and is current on its tax obligations. All of the Debtor's Creditors are unsecured Creditors as noted above.

**B.    Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan. READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

(1)    WHO CAN VOTE OR OBJECT,

(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,

(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,

(5)    WHAT IS THE EFFECT OF CONFIRMATION, AND

(6)    WHETHER THIS PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure

Statement, the Plan provisions will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court ("Court") has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**C.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.    Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on _____, 2017, _____ at p.m. in Courtroom 302 of the U.S. Bankruptcy Court located at 21041 Burbank Boulevard, Woodland Hills, California 91367.

**2.    Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot to Debtor's insolvency counsel, ***ABBASI LAW CORPORATION at 8889 WEST OLYMPIC BLVD., SUITE 240, BEVERLY HILLS, CALIFORNIA 90211; TELEPHONE (310) 358-9341; FACSIMILE (888) 709-5448.*** Your ballot must be received by _____, 2016, during business hours (local time) or it will not be counted.

**3.    Deadline For Objecting to the Confirmation of the Plan**

Objections to the Confirmation of the Plan must be filed with the Court and served upon the Debtor and the U.S. Trustee.

**4.    Identity of Person to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact its own attorney.

///

1

### D.    Disclaimer

2    The financial data relied upon in formulating the Plan is based on the Debtor's internal
3    financial information and its estimations concerning its future performance. The Debtor has
4    provided the information contained in this Disclosure Statement. The information is not audited.
5    The Debtor represents that everything stated in the Disclosure Statement is true to its best
6    knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes
7    no recommendation as to whether or not you should support or oppose the Plan.

8

### E.    Explanation of Chapter 11

9    Chapter 11 is a Reorganization Chapter. In Chapter 11, the Debtor or "Debtor-In-
10    Possession" reorganizes its business. To begin a Chapter 11 case, a Petition is filed.  Filing the
11    Petition creates an estate which owns a debtor's assets (legal and equitable interests) and
12    property acquired after the bankruptcy case is begun. In Chapter 11, Debtors operate their
13    business unless the court orders otherwise or appoints a trustee.  In this instance, the Debtor (Tul
14    Investments, Inc.) is the Debtor-In-Possession ("DIP") here.

15    Filing a Chapter 11 Petition creates the automatic stay which stops attempts to collect
16    prepetition claims or to interfere in a debtor's business operation. Developing a Plan (with the
17    disclosure statement) to Reorganize is why many Chapter 11 cases are filed. The Plan explains
18    how the Debtor will be paying its obligations. The Plan is a contract between a Debtor and its
19    Creditors. The Plan provides how and when (and in what amount) Creditors will be paid.  Plans
20    can be liquidating Plans where assets are sold. Plans can be Reorganizing Plans (as is the case
21    here) where the Debtor will continue to operate its business and pay Creditors a dividend. Plans
22    can be a combination of both liquidation and reorganization. Plans may provide that a Debtor will
23    sell its business to a third-party and then pay a dividend to Creditors.

24    A Disclosure Statement is designed to contain adequate information of a kind and in a
25    sufficient detail to allow a hypothetical and reasonable investor (similar to the Debtor's creditors)
26    to decide whether to support or Oppose a Plan.  If the Court approves the Disclosure Statement,
27    then the Disclosure Statement can be sent to Creditors, together with the Plan and a ballot.
28    Creditors are then given the opportunity to vote to accept or to reject the proposed Plan.  Creditor

1  also have the opportunity to file an Objection to the Plan if they wish.

2  For a Plan to be Confirmed, the Plan must satisfy the various requirements of §1129(a).
3  Some of sub-section (a)'s requirements include, the Plan must be proposed in good faith, the
4  Plan must meet the best interests of Creditors test (that the value being distributed to claimants is
5  not less than these parties would receive in the event of liquidation), and the Plan must be
6  feasible (a reasonable probability that the Debtor will be able to meet its Plan obligations).

7  If any of the classes of Creditors which are impaired (a term of art) vote to reject the Plan,
8  then §1129(b)'s requirements must be met too. That sub-section has various requirements.
9  These requirements are discussed in considerable detail below. Briefly, if an impaired class votes
10  not to reject the plan, a Debtor can still seek Plan Confirmation and a Court can confirm a plan if
11  certain requirements are met.  These requirements are often called the "cram-down."

12  **II.**

13  **BACKGROUND**

14  **F.    Description and History of the Debtor's Business**

15  The Debtor is a California Corporation which was incorporated on August 10, 1995. The
16  Debtor operates only in California and mainly in the Greater Los Angeles area.

17  **G.    Principals/Affiliates of Debtor's Business**

18  Debtor's President, Yuval Stemlach, operates and makes most of its business and legal
19  decisions.

20  **H.    Management of the Debtor Before and After the Bankruptcy**

21  At different times, Yuval Stelmach (husband) or Taly Stelmach (wife) have managed the
22  Debtor's assets. As it stands, REM, LLC is managing the Debtor's assets at the direction of Yuval
23  Stelmach.

24  **I.    Events Leading to Chapter 11 Filing**

25  The main factor leading up to the herein filing was the pending execution of a levy by
26  equity owner and judgment-creditor Mr. Goldberg. This levy relates to a June 26, 2013 State
27  Court Judgment ("State Court Judgment") which arises out of a lawsuit entitled <u>Shlomo Goldberg
28  v. Yuval Stelmach et al.</u> with a Trial Court Case No. of LC075563 ("State Court Action"). As

explained below, the State Court Judgment was appealed to Court of Appeal under Case No. B250524 (hereinafter "Appeal"). However, the Appeal was denied and the Judgment was upheld. Therefore, the Debtor seeks to administer the payment of this debt via its Plan.

On November 28, 2016, Mr. Goldberg filed Proof of Claim No. 2 ("POC-2") for the stated sum of **$547,022.26** ("POC Sum").  As set forth in the Declaration of Yuval Stelmach, the Debtor maintains that the State Court Judgment is in reality an equity claim disguised as a Creditor claim. The Debtor bases the above contention on the fact that the  State Court Judgment does not involve or arise out of Estate property. Further, this judgment makes no finding of any malfeasance by Mr. Stelmach involving this Estate. Instead, this judgment relates exclusively to disputed disbursements made to the Debtor from an unrelated interpleader judgment involving the sale of Non-Estate. The Debtor maintains that this sale was supposed to buy-out Mr. Goldberg's interests but the proceeds were instead used to pay for legal fees and costs incurred in the past 12 years of litigation between Mr. Goldberg and Mr. Stelmach. Therefore, the Debtor maintains that the State Court Judgment amounts to an equity claim. However, the Debtor's Plan does not seek to resolve any ownership dispute.

In sum, the State Court Judgment has been entered "jointly and severally" against the Debtor, Yuval Stelmach, and REM LLC. As it stands, the enforcement of the State Court Judgment has not been stayed as to Yuval Stelmach, and REM LLC because of the Debtor's bankruptcy.

**J.    Significant Events During the Bankruptcy**

**1.    Bankruptcy Proceedings**

The Debtor has been the DIP since this case has been filed and has been managing tis own affairs. The following is a list of significant events and actions that occurred in this case from the date of the filing to the present:

- The Debtor filed its Petition, completed its Schedules and the Statement of Financial Affairs by on or about **October 3, 2016**.

- The Debtor complied with the documentary requests of the U.S. Trustee's Office after the filing and finalized of the Petition. The Debtor has filed its October, November, and December 2016 Monthly Operating Reports.

- On or about **November 7, 2016**, the Debtor filed a dissolution action entitled Tul investments, Inc. v. ABMS, LLC with Case No. BC636609 with an Involuntary Dissolution and Declaratory Causes of Action to dissolve GW to fund the Debtor's Plan.

- The 341 (a) Meeting of Creditors was held and concluded on **November 8, 2016**. The Debtor's principal, Yuval Stelmach, appeared on behalf of the Debtor.

- On or about **November 28, 2016**, Goldberg filed Proof of Claim No. 2 demanding $547,022.26 from the Estate as a Judgment Creditor.

- On **December 6, 2016** the Notice of Bar Date for Filing Proofs of Claim was served on all creditors and parties in interest by the Debtor. The Claims Bar Deadline was set for **February 7, 2017** by the Court.

- On or about **December 1, 2016**, the Debtor obtained a Broker's Price Opinion ("BPO") from a licensed commercial broker for the Debtor's real property holdings. *See attached Declaration of Chris Comfort.*

- After the Proof of Claim Deadline, the Debtor shall undertake an investigation into the Proof of Claim filed in this case and file any required Proof of Claim Objection.

- Currently, the Debtor is compiling its financials for 2016 in order to file its 2016 taxes and to obtain the needed information and documents to secure a loan if the dissolution of GW is not finalize quickly.

- Upon approval of the Disclosure Statement, the Debtor will be move ahead with its Plan which is very simply. In short, the Debtor's plan seeks to repay Creditors based on the above-cited listed treatments. The Debtor's Plan calls shall be funded either by the dissolution of GW and or a new loan along with monthly payments for the next five (5) years.

2.    **Other Legal Proceedings**

As explained above, the Debtor is currently involved in a dissolution action entitled Tul investments, Inc. v. ABMS, LLC with Case No. BC636609 which asserts an Involuntary Dissolution and Declaratory Causes of Action to dissolve GW to fund the Debtor's Plan.

3.    **Actual and Projected Recovery of Preferential Transfers or Fraudulent**

     **Conveyances**

The Debtor does not believe there are any preferential transfers or fraudulent conveyances. To the extent any such actions may exist, the Debtor specifically retains jurisdiction post-petition to bring any such actions.

4.    **Procedures Implemented to Resolve Financial Problems**

In order to become more profitable, the Debtor has implemented many internal

management changes to lower costs and to increase efficiency. The discussion which follows is not meant to include all of the changes but some of them. The following will help fund the Debtor's Plan for Reorganization by lowering operating costs while concurrently increasing income:

**A.    OPERATIONAL CHANGES TO INCREASE INCOME & LIMIT COSTS:**

- For the past year, the Debtor has been using an in-house licensed real estate broker (Morani Stelmach, Esq.) to lease space at the Brentwood Property and the other properties owned by GW and Tul Anthony for 50% of the standard rate.

- The Debtor has ceased building-out tenant improvements at Debtor's cost at the Brentwood Property. Further, the board of GW and Tul Anthony have made the same change for the properties they own and manage. Overall, all improvements for any current or future tenant will be paid for 100% by the tenant.

- The Debtor has changed the landscaping for the Brentwood Property into "desert landscaping" which will eliminate most landscaping needs and costs. The Debtor has proposed to the board and managers of GW and Tul Anthony has also changed the landscaping for their real property holdings.

- The Debtor has streamlined its management of the Brentwood Property to limit costs with the use of in-house crews for minor and maintenance work instead of paying outside vendors for the same. However, the Debtor will still use competent licensed professionals for substantial or specialize repairs when required.
- The board and managers of GW and Tul Anthony have agreed to use in-house crews for minor repairs and maintenance work when possible, and agreed to use new more efficient vendors to lower the upkeep costs for their properties. However, the Debtor will still use competent licensed professionals for substantial or specialize repairs when required.

- The Debtor and the board and managers of GW and Tul Anthony have agreed to make energy saving modifications (such as replacing all light-bulbs with energy saving light-bulbs) to the common-areas of the properties; modify the windows to use more natural light instead of electricity; and to make other modifications to the properties to lower operating costs. These change will be in full effect as to all properties within the next 6 months.

**B.    LEASE CHANGES AND UPGRADES TO INCREASE INCOME & LIMIT COSTS:**

- Brentwood Property: The value of this property is set to rise because of the new school at the corner of Sunset & Barrington in West Los Angeles. The opening of this new school will continue the increase of foot-traffic (parents with their kids) in the area which will greatly benefit the surrounding businesses. Further, as mentioned before, the Debtor had made energy saving modifications to this property to lower operational costs. Finally, the operational costs will further decrease due to the change of landscaping to "desert landscaping."

  o Lease Changes: As it stands, the tenants for this property have gross leases with no obligation to pay for the costs of the property. Upon the

11

expiration of each lease, the Debtor will change the terms of the lease to a triple-net lease to pass through the costs of property to the tenants. This change will be in effect as to all properties within the next 12 months.

- o Increase Income: The Debtor will also be seek at least a 15% increase from the tenants because of the improving economy. Further, the use of an in-house broker with 50% reduced rates will also provide additional savings which is not included in the above-cited savings estimate.

- Reseda Property: The income generated from this property will increase significantly because anchor tenant's lease which occupies 13,000 out of 16,0000 square feet was increased as of November 1, 2016. The prior lease was entered into when the local real estate market was at its worst (2011). As noted before, the Debtor's Plan will include improvements and upgrades which allow the ownership to obtain more rents.

- o Changes/Modifications: As noted, the owner is making energy saving modifications to lower operational costs. Further, the landscaping for this property has been changed to "desert landscaping" to further reduced operational costs.

- Western Property: The income generated from this property increased in 2016 after two (2) leases expired on December 1, 2015. The prior leases were significantly below the market as they were entered into at a time when the local market was at its worst.

- Chatsworth Property: This property is currently less than 50% occupied but it has great potential if it is developed further. Overall, based on the current market and demand, the Debtor estimates that this property can become at least 75% occupied by mid-2017 if the ownership invests the required monies to renovate and upgrade this property in the next 3-Months. The ownership tried to sell this property last year but the listing did not generate any good offers.

## 5. Current and Historical Financial Conditions

i. Historical Financial Information.

In this instance, the best indicator of the Debtor's income and expense for the past two (2) years are contained in the Monthly Operating Reports and the Debtor's 2015 taxes (See Exhibit "O" to the Declaration of Yuval Stelmach). The Debtor's income for 2016 which much higher than in 2015 and its expenses were far lower because of all of the energy saving upgrades and management reforms instituted. Overall, the Debtor 2016 financials will show a clear lowering of expenses and an increase in income.

As it stands, the Debtor's DIP Account has about $65,000.00 in place to partially fund the Debtor's Plan. The Debtor has filed its 2015 taxes (See Exhibit "O" to the Declaration of Yuval

Stelmach) and Debtor is waiting for additional K-1s, and other income data to file Debtor's 2016 taxes. However, the Debtor has enclosed the following information on the Debtor's finances:

- Exhibit "H" to the Declaration of Yuval Stelmach contains the 2015 profit and loss for each of the Debtor's properties. The Debtor is working on its financials for 2016. The Debtor will supplement its income and expense calculations for 2016 as soon as they are available. Overall, the Debtor 2016 income was much better than in 2015 while its expenses were also significantly lower.

- Exhibit O" is a true and correct copy of the Debtor's 2015 income tax. The Debtor is working on its 2016 taxes.

ii.   Current Financial Information.

Assets. The Debtor's assets include the following:

- Monies on hand. As of January 27, 2017, the Debtor has **$64,174.10** in cash on hand. *See last DIP bank statement attached as Exhibit "G" to the Declaration of Yuval Stelmach.*

- Debtor's Real Property Holdings. (*See Declaration of Chris Comfort*)

  - 101 to 107 Barrington Walk in Brentwood California 90049
    Estimate Value:      **$2,100,000.00**

  - 7126 Reseda Blvd., Reseda California 91335
    Estimate Value:      **$3,450,000.00**

  - 1880 S Western Los Angeles, California 90006
    Estimate Value:      **$5,000,000.00**

  - 17050 Chatsworth Street Granada Hills, California 91344
    Estimate Value:      **$10,000,000.00**

**II.**

## SUMMARY OF THE PLAN OF REORGANIZATION

**A.      What Creditors and Interest Holders Will Receive Under The Proposed Plan**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive. The Debtor Plan calls out for a down payment with a monthly payment plan for each Creditor being paid through the Plan.

As per the Debtor's Monthly Operating Reports which provides the basis for estimating its revenues, cost of goods sold, expenses and net profit during the Plan term along with payments proposed to be made to holders of clams against the estate. The discussion below summarizes the payments under the plan. Under the Debtor's Plan, the following payments will be made:

| CLASS # | CLAIMS | PLAN TREATMENT | PAYMENTS |
|---|---|---|---|
| ADMINISTRATIVE (LEGAL FEES & COSTS) | $20,000.00 (estimate) | NO | Paid in full on Effective Date |
| ADMINISTRATIVE (US TRUSTEE) | TBD | NO | Pay via Quarterly Payment through Plan |
| Class 1 (UNSECURED-CONTRACTOR) | Gil's Electrical Service Proof of Claim No. 4 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 1 (UNSECURED-CONTRACTOR) | AZ Air-conditioning & Heating Proof of Claim No. 5 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 1 (UNSECURED-CONTRACTOR) | Pacific Builders Proof of Claim No. 6 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 2 (GENERAL-UNSECURED) | Gil Naor Proof of Claim No. 7 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 2 (GENERAL-UNSECURED) | Assaf Naor Proof of Claim No. 8 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 3 (JUDGMENT-CREDITOR & OWNER) | Shlomo Goldberg Proof of Claim No. 2 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class-4 (LINE OF CREDIT-UNSECURED CREDITOR) | East West Bank (has not yet filed a proof of claim) | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 5 (EQUITY-OWNERSHIP) | Shlomo Goldberg owns 7.5% of Debtor | NO | Goldberg will own 7.5% as of Effective Date. |
| Class 5 (EQUITY-OWNERSHIP) | Estate of Lea Goldberg's owns 7.5% of Debtor. | NO | Estate of Lea Goldberg's will own 7.5% as of the Effective Date. |
| Class 5 (EQUITY-OWNERSHIP) | Yuval and Tally Stelmach own the remaining 85% of the Debtor. | NO | Yuval and Tally Stelmach will own 85.00% as of Effective Date. |

**B.     Unclassified Claims**

Certain types of claims are not placed into voting classes; they are not classified. They are not considered impaired and do not vote on the Plan, as they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the proponent has not placed the following claims in a class.

**1.     Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's

Chapter 11 Case which are allowed under Code §507(a)(1). The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The following chart lists all of the Debtor's §507(a)(1) administrative claims and their treatment under the Plan.

| Name | Amount Owed | Treatment |
|---|---|---|
| Law Office of Abbasi Law Corporation | $20,000 (estimated but likely to be higher) | Paid in full on effective date, Fees & costs may be higher |
| US Trustee's Office | TBD | Paid in full on Effective Date; Future fees to be paid via Quarterly Payments through the Plan. |
| | Total: $20,000.00 | |

**2.    Court Approval of Fees Required:**

The Court must rule on all fees listed in this chart before the fees will be owed. For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

The Debtor will need to pay _____ worth of administrative claims on the Effective Date of the Plan unless the claimant has agreed to be paid later or the Court has not yet ruled on the claim. The Debtor will have the necessary monies on hand on the Effective Date.

**3.    Priority Claims**

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires each holder of such a 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding five years from the date the bankruptcy petition is filed.

In this instance, the Debtor has no priority tax claims as the Debtor is current on its Local, State and Federal tax liabilities. Therefore, there are no such claims to be treated under the Plan.

**C.    Classified Claims and Interest**

**1.    Classes of Secured Claims**

Secured claims are claims secured by liens on Estate property. In this instance, the Debtor has no secured creditors. Therefore, there are no such claims to be treated under

Debtor's Plan.

## 2.    Class 1 of General Contractor Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under §507.  The following chart identifies their treatment. This class of unsecured creditors have no other source of recovery but the Debtor.

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| Class 1 (UNSECURED-CONTRACTOR) | Gil's Electrical Service Proof of Claim No. 4 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 1 (UNSECURED-CONTRACTOR) | AZ Air-conditioning & Heating Proof of Claim No. 5 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 1 (UNSECURED-CONTRACTOR) | Pacific Builders Proof of Claim No. 6 | YES | 50% of Claim; Amount TBD after Claim Objections. |

## 3.    Class of General Unsecured Claims 2 and 3 (Claimants Holding Separate Means to Collect on Claims)

The members of this class of those creditors holding unsecured claims against the Debtor but who also hold a legal right to enforce the same claim against a third party, e.g. Yuval Stemlach, the Debtor's principal and/or REM, LLC.  The treatment of members of this class is described here and in the plan projections.

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| Class 2 (GENERAL-UNSECURED) | Gil Naor Proof of Claim No. 7 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 2 (GENERAL-UNSECURED) | Assaf Naor Proof of Claim No. 8 | YES | 50% of Claim; Amount TBD after Claim Objections. |
| Class 3 (JUDGMENT-CREDITOR & OWNER) | Shlomo Goldberg Proof of Claim No. 2 | YES | 50% of Claim; Amount TBD after Claim Objections. |

## 4.    Class of General Unsecured Claims 4 - Insiders

General unsecured insider claims are unsecured claims not entitled to priority under §507(a).  Essentially, an insider is a person with a close relationship with the debtor, other than a creditor-debtor relationship. As explained above, the Debtor has a pending ownership dispute as one of its owners has passed away (Lea Goldberg). Further, as explained in the Declaration of

Yuval Stelmach, the POC-2 filed by Goldberg is in actuality an equity claim. Therefore, Mr.

Goldberg's claim has been classified on its own based on POC-2.

| Class # | Description | Impaired (Y/N) | Treatment |
|---|---|---|---|
| Class-4 (LINE OF CREDIT- UNSECURED CREDITOR) | East West Bank (has not yet filed a proof of claim) | YES | 50% of Claim; Amount TBD after Claim Objections. |

**5.    Class(es) of Interest Holders**

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the

Debtor.  The following chart identifies the Plan's treatment of the class of interest holders

| Class # | Description | Impaired (Y/N) | Plan Treatment |
|---|---|---|---|
| Class 4 | Shlomo Goldberg owns 7.5% of the Debtor. | No. | Goldberg will own 7.5% of the Debtor as of the Effective Date. |
| Class 4 | Estate of Lea Goldberg's owns 7.5% of the Debtor. | No. | Estate of Lea Goldberg's will own 7.5% of the Debtor as of the Effective Date. |
| Class 4 | Yuval and Tally Stelmach own the remaining 85% of the Debtor. | No. | Yuval & Tally Stelmach will own 85% of the Debtor as of the Effective Date. |

**B.    Means of Effectuating the Plan**

**1.    Funding for the Plan**

The Plan will be funded by the following:

- The Debtor's business operation.

- The $64,174.10 monies currently in the Debtor's DIP Account.

- The Debtor is seeking to dissolve its interests in GW to fund the Plan in the next 60-90 days. The Debtor estimates that it can use $250,000 from the dissolution of GW to fund its Plan.

- If GW does not dissolve as planned, the Debtor shall obtain financing secured by the Debtor's property to fund the Debtor's at the Plan's Effective Date. The Debtor is working on its financials and taxes for 2016 which will be ready in the next 60 days. The Debtor estimates that it can obtain a loan for at least $250,000 to fund its Plan in 60-90 days.

- The Debtor plans to pay a down payment for each impaired claim upon the Effective Date. Thereafter, the Debtor Plans calls out for monthly payment of about $20,000.00 for a five (5) year period.

**2. Post-confirmation Management**

Yuval Stemlach will continue as the Debtor's president and will be in overall charge of the Debtor's business operation.

**3. Disbursing Agent**

Yuval Stemlach shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan.

**C. Risk Factors**

The proposed Plan has the following risks:

The corporation's income may not meet expectations. Although the Debtor has worked diligently to produce estimates of values and income, it is not possible to make such predictions with certainty. It may be that in coming years, there could be another crash in the real estate market in Southern California like in the years of 2007 to 2010. Therefore, if its income falls significantly short, the Debtor may be forced to modify the Plan, convert the case to chapter 7 and liquidate its assets. However, the Debtor believes that barring unforeseen circumstances its projections are accurate.

**D. Other Provisions of the Plan**

**1. Executory Contracts and Unexpired Leases**

**a. Assumptions**

The following are the unexpired leases and executory contracts to be assumed as obligations of the reorganized Debtor under this Plan:

1. Management Agreement with REM, LLC for the management of Debtor's assets.

2. Operating Agreement dated April 1, 1999 with ABMS, LLC.

On the Effective Date, and only to the extent any further assumption is necessary, the

obligations listed above shall be assumed as obligations of the reorganized Debtor. The Order of the Court confirming the Plan shall constitute an Order approving the assumption of each lease and contract listed above. If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

### b. Rejections

Any and all prepetition executory contracts and unexpired leases not expressly assumed above is rejected. The order confirming the Plan shall constitute an Order approving the rejection of the lease or contract. If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to Plan confirmation.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS 30 days following entry of the order confirming this Plan. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

### 2. Changes in Rates Subject to Regulatory Commission Approval

Not applicable.

### 3. Retention of Jurisdiction

This Court will retain jurisdiction to the fullest extent provided by law.

### E. Tax Consequences of Plan

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor. The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action. Creditors may wish to consult their own financial experts to see

1   what tax impact, if any, they may have.

2       The following are the tax consequences which the Plan will have on the Debtor's tax
3   liability:  None expected.

4                                              III.

5                       **CONFIRMATIN REQUIREMENTS AND PROCEDURES**

6       PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THIS PLAN
7   SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING
8   A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended
9   solely for the purpose of alerting readers about basic confirmation issues, which they may wish to
10  consider, as well as certain deadlines for filing claims.  The proponent CANNOT and DOES NOT
11  represent the discussion below is a complete summary of the law on this topic.

12      Many requirements must be met before the Court can confirm a Plan. Some of the
13  requirements include that the Plan must be proposed in good faith, acceptance of the Plan,
14  whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7
15  liquidation, and whether the Plan is feasible.  These requirements are not the only requirements
16  for confirmation.

17  **A.    Who May Vote or Object**

18      **1.    Who May Object to Confirmation of the Plan**

19      Any party in interest may object to the confirmation of the Plan, but as explained below not
20  everyone is entitled to vote to accept or reject the Plan.

21      **2.    Who May Vote to Accept/Reject the Plan**

22      A creditor or interest holder has a right to vote for or against the Plan if that creditor or
23  interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2)
24  classified in an impaired class.

25          **a.    What Is an Allowed Claim/Interest**

26      As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to
27  have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party
28  interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed,

the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

**THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE IS <u>FEBRUARY 7, 2017</u>**. A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Consult the exhibits to see how the Debtor has characterized your claim or interest.

        **b.    What Is an Impaired Claim/Interest**

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

Here the Debtor believes all classes are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  Parties who dispute the Debtor's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan. Parties who dispute this characterization of their claim or interest as being impaired or unimpaired may object to the Plan contending the Debtor has incorrectly characterized their class.

        **3.    Who is Not Entitled to Vote**

The following four types of claims are <u>not</u> entitled to vote: (1) disallowed claims; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.

Claims entitled to priority pursuant to Code §§507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain

treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram-down" on non-accepting classes, as discussed below.

### 6.    Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

### 7.    Treatment of Non-Accepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Code. The process by which non-accepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cram-down." The Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law. What follows is a more detailed

1  discussion of these legal requirements in the event the Debtor seeks confirmation via a "cram-
2  down."

3       Even if only one of the impaired classes votes to accept the proposed Plan, the Court may
4  nevertheless confirm the Plan if the Plan treats the non-accepting class(es) in the manner
5  required by Section 1129 of the Code.  Section 1129(a) sets forth a series of requirements which
6  the Plan must comply with in order to be approved.  The various requirements include: the Plan
7  complies with applicable provisions of the Bankruptcy Code; the Plan has been proposed in good
8  faith; with respect to each impaired class of claims, each holder of claim in such class has
9  accepted the Plan or will receive value that is not less than the amount that such holder would
10  have received if the Debtor was liquidated in chapter 7; as to the classes, each class votes to
11  accept the Plan or said class is not impaired under the Plan; specific treatment of administrative
12  claims; that at least one class of claims that is impaired under the Plan has accepted the plan;
13  and confirmation of the plan is not likely to be followed by Debtor's liquidation.

14       If all of the elements required by Sec. 1129(a) are met (other than the requirement that
15  each class has accepted the plan or is not impaired under the plan §1128(a)(8)), the Debtor may
16  request that the Court confirm the plan if the plan does not discriminate unfairly, and is fair and
17  equitable, with respect to each class of claims that is impaired and has not accepted the plan.
18  §1129(b).

19       The condition that a plan be fair and equitable as to a secured claim requires the
20  following: the secured creditor keeps its lien(s), it is paid deferred cash payments totaling at least
21  the allowed amount of that creditor's claim and the payments made are worth at least the value of
22  that creditor's security.

23       The condition that a plan be fair and equitable with respect to an unsecured class includes
24  the following requirements: each holder of a claim in the class receives, as of the Effective Date,
25  property or monies equal to the allowed amount of the claim, or no monies will be paid to junior
26  claimants and/or interest holders will not retain any interest(s) under the plan.  Confirming the
27  Plan without acceptance of all impaired classes is called a "cram-down."  All claims except those
   held by administrative claimants can be crammed down in a Chapter 11 Plan.
28

In some reorganizing plans, a debtor's principals, in order to retain their equity interests, offer new value, money, to creditors to be paid through the plan. A debtor will propose to infuse new value if it believes that unsecured classes may vote against plan confirmation and that new value may be required under §1129 of the Bankruptcy Code. Please note that the proposed Plan treatment described by this Disclosure Statement can be crammed down on all classes.

B.    **Liquidation Analysis**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reasons:

In this instance, the Debtor does not own any property directly. Further, the entities that own the properties have other members, shareholders and managers whom may not agree to sell the properties and demand involuntary dissolution because of the capital gains each sale will cause the ownerships. Therefore, there is no easy mechanism for the liquidation of the Debtor assets. Further, a liquidation of the Debtor's assets will require the retention and costs of an

attorney to prosecute dissolution actions, a real estate broker to list property for sale, sale & escrow costs, and as noted before the payment of taxes on the gains from each sale which will be in substantial in most instances. Therefore, under the Debtor's Plan all classes receive more than they would in the event of a liquidation.

**C.    Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date. Further, the Plan Proponent must show that all aspects of feasibility are satisfied.

As evidenced explained in the Declaration of Yuval Stelmach, the Debtor has positive rental income from each of its holdings in 2015 (See Exhibit "H"). Further, as explained above, the Debtor has undertaken an extensive effort to lower utility costs, build-out costs, landscaping costs, and other savings measures to increase profitability. As such, the Debtor's income for 2016 has greatly increased while its expenses have decreased since 2015. Finally, the Debtor has about $65,000 in cash on hand; and is set to receiver $250,000 from either the dissolution of GW or via a loan. Therefore, the Debtor's Plan is feasible and fully in line with its financial capacity.

In sum, the financial projections demonstrate the Debtor can pay its bills as they come due plus the money needed to make Plan payments. Overall, the improving real estate market will allow for the resetting of leases and the plan upgrades to the properties will lower costs. The combination of lowered costs and increased income will help fund the Debtor's Plan. CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL STATEMENTS.

///

////

## IV.

## EFFECT OF CONFIRMATION OF PLAN

**D.    Discharge**

This Plan provides that upon the effective date, the Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C.§1141. However, the discharge will not discharge any liability imposed by the Plan.

**E.    Revesting of Property in the Debtor**

Except as provided in the Disclosure Statement and Plan confirmation of the Plan revests all of the property of the Estate in the Debtor.

**F.    Modification of Plan**

The Proponent of the Plan may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated <u>and</u> (2) the Court authorizes the proposed modifications after notice and a hearing.

**G.    Post-Confirmation Status Report**

Within 120-Days of the entry of the order confirming the Plan, or as otherwise directed by the Court, the Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Further reports shall be filed every 120-Days or as directed by the Court and served on the same entities.

**H.    US Trustee's Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to date of confirmation shall be paid to the United States Trustee on or before the effective date of the plan. Quarterly fees accruing under 28 U.S.C. §1930(a)(6) after confirmation shall be paid to the United States Trustee in accordance with 28 U.S.C. §1930(a)(6) until entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.

The Debtor's Plan requires payments of all incurred US Trustee's Fees to be paid on a quarterly basis.

**I.    Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under §1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Court orders, the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7, Estate.  The automatic stay will be re-imposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

The Order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the Order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180-Days after the entry of the order of confirmation.

**J.    Final Decree**

Once the Estate has been fully administered as referred to in F.R.B.P. Rule 20 3022, Debtor shall file a Motion to obtain a Final Decree to close the Case.

**K.    Valuation of Debtor's Assets; Releases of Security Interests**

The Debtor has no creditor with a security interest on its assets or property.

*(remainder of page intentionally left blank)*

1    DATED: January 27, 2017        **TUL INVESTMENTS, INC.**

2

3                                       YUVAL STEMLACH

4

   DATED: January 27, 2017        **ABBASI LAW CORPORATION**

5

6

                                By:

7                                    MATTHEW ABBASI, ESQ.,
                                   DEBTOR, AND DEBTOR-IN-POSSESSION,

8                                    TUL INVESTMENTS, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28